[Crim. No. 44005. Second Dist., Div. One. Feb. 17, 1984.]

THE PEOPLE, Plaintiff and Appellant, v.
DAVID KENNETH COSTER, Defendant and Respondent.

**Counsel**

Robert H. Philibosian, District Attorney, Donald J. Kaplan, Judy L. Gray and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Mitchell J. Grossman and Ronald B. Davey, Deputy Public Defenders, for Defendant and Respondent.

**Opinion**

**LILLIE, J.**—By felony complaint defendant was charged with nine counts of grand theft (Pen. Code, § 487, subd. 1), nine counts of unlawful sales of unqualified securities (Corp. Code, §§ 25110, 25540), and nine counts of unlawful sales of securities through misrepresentation (Corp. Code, §§ 25401, 25540).[1] The securities allegedly consisted of installment notes bearing interest and providing for payment of a percentage of the gross income generated by defendant's business. The magistrate dismissed the 18 counts charging unlawful sales of securities on the ground that the notes are not securities. The People appeal from an order denying their motion to reinstate those counts.[2] (Pen. Code, § 871.5.)

---

[1]Defendant allegedly committed each of these three offenses against eight different persons or groups of persons. As to one such person defendant committed the offenses on two occasions in two separate transactions.

[2]The order is appealable. (Pen. Code, § 1238, subd. (a)(9).)

At the preliminary hearing Meryl Wamhoff, one of the complaining witnesses, testified: He read an advertisement in a newspaper indicating that "20 percent interest and one percent of the gross" would be paid for a $20,000 investment. He called the telephone number given in the advertisement and reached Coster Manufacturing Company, located in Palmdale. The individual with whom he spoke identified himself as David Coster (defendant). Defendant told Wamhoff that the company manufactured steel blades used in automobile bodies; he sold the blades in both the United States and foreign countries and had a "growing business"; he needed cash to buy machinery, but did not want to wait until he accumulated money on a monthly basis; he wanted to expand the business "right now" with investor income. In July 1980, after his telephone conversation with defendant, Wamhoff visited Coster Manufacturing Company. There defendant showed him orders for the blades, the boxed product ready for shipment, the machinery used to manufacture it, and "how the operation worked." Defendant and his wife said that the business had a gross income of $250,000 in 1979,[3] $100,000 thus far in 1980, and that a gross income of more than $1 million was expected in a year or two. Defendant told Wamhoff that any money he invested would go toward the purchase of an injection mold machine which cost $25,000 with cash payment required; he added that Wamhoff's money "would be directly in . . . that injection machine and . . . 'You'll own your part of that.'" Defendant said that he would like an investment of $20,000; Wamhoff replied that he could invest only $5,000 and defendant decided to accept that sum. On July 31, 1980, Wamhoff gave defendant a check for $5,000; defendant signed, had notarized, and gave to Wamhoff an installment note whereby defendant promised to pay him 20 percent interest on the $5,000 and 1 percent of the gross income of the business as it was received each month during the one-year duration of the note. Wamhoff received eight interest payments and two payments as his share of the gross income. The principal sum of $5,000 was not paid.

The experience of Marshall Mercer, another complaining witness, was similar to that of Wamhoff. Mercer testified: He first learned of defendant's business when he saw the following advertisement in the Antelope Valley Press: "CASH or BACKING NEEDED For rapidly expanding business. Will pay 26% int. & ½% of gross for each $2500 invested. (Gross running $100,000+)." After reading the advertisement Mercer telephoned Coster Manufacturing Company and spoke with a man who identified himself as Coster; defendant invited Mercer to come to Palmdale to see the business. In February 1981 Mercer accepted the invitation. On that occasion defend-

---

[3] In fact the gross income in 1979 was $89,735.16. Had Wamhoff known this, he would not have invested in the company.

ant described the company as a thriving business which grossed $100,000 per year; he called Mercer's attention to the high quality of the steel blade and said it was the quality of his product that made it successful; he showed Mercer an injection mold machine and said that he needed another such machine, as well as additional inventory, to keep up with his expanding business which included foreign sales. Defendant told Mercer that if he decided to invest, his money would be used to purchase raw materials; he promised Mercer two payments each month on his investment, one as interest and the other as his share of the gross income of the business. On February 24, 1981, Mercer gave defendant a check for $5,000 and received from defendant an installment note which provided for payment of 20 percent interest and 1 percent of gross income.[4] After making the $5,000 investment Mercer returned to the company several times. He was greatly impressed by defendant's apparent ability and obvious sincerity, and was eager to participate in the business. Accordingly, on March 12, 1981, Mercer invested the further sum of $35,000 which was to be used to buy a second injection mold machine and more raw materials. For the $35,000 paid by Mercer defendant gave him an installment note providing for 20 percent interest and 7 percent of gross company income, both interest and percentage of income payable monthly during the one-year term of the note. Mercer received two interest payments on his $5,000 investment and one on his $35,000 investment; on neither investment did he ever receive a percentage of gross company income. No part of the principal sums was ever paid.

Wamhoff and Mercer testified on the first day of the preliminary hearing. At the beginning of the second day the magistrate and counsel met in chambers and discussed whether the installment notes were securities within the meaning of Corporations Code section 25019; the People advised the magistrate that as to such issue the evidence pertaining to the remaining 12 securities counts would be substantially the same as that already presented on 6 of those counts. In open court, before the People presented any further evidence, defendant moved to dismiss the 18 counts based on violations of the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.) arguing

---

[4]The note read:

"INSTALLMENT NOTE ON INTEREST AND PERCENT ON GROSS COMPANY INCOME

"$5,000.00 Palmdale, California February 24, 1981

"In installments as herein stated, for value received, we promise to pay to Marshall M. or Marjorie J. Mercer, the sum of five thousand dollars, twelve months or less from the date of note, with 20% interest payable in stallments [*sic*] of $83.33 on the 24th day of each month, beginning on the 24th day of March and continuing for the duration of this note, also as a supplement to this note Coster Manufacturing Company will pay 1% of gross Company income for the duration of this note, payable month after sales are completed.

"In case suite [*sic*] is instituted to collect this note or any portion thereof, Coster Manufacturing Company promises to pay such sum as the court may fix as attorney's fees.

"/s/ David K. Coster

"/s/ Charlene Coster "

that the evidence did not show transactions which were intended to be regulated by the securities law. The magistrate granted the motion stating: "I would make a finding as a matter of law—that these are not securities and therefore Counts II, III, V, VI, VIII, IX, XI, XII, XIV, XV, XVII, XVIII, XX, XXI, XXIII, XXIV, XXVI and XXVII are dismissed."[5] In superior court the People moved for an order directing the magistrate to reinstate such counts on the ground that their dismissal was erroneous as a matter of law. (Pen. Code, § 871.5.) The motion was denied; this appeal followed.

■ Corporations Code section 25019 defines security to include "evidence of indebtedness" and "investment contract."[6] Appellant contends that the installment notes made by defendant come within those terms. ■ Among the sources of the definition of "security" in section 25019 is section 2, division 1, of the federal Securities Act of 1933 (15 U.S.C., § 77b, (1)). (*Hamilton Jewelers* v. *Department of Corporations* (1974) 37 Cal.App.3d 330, 333 [112 Cal.Rptr. 387].) Under that statute, the term "evidence of indebtedness" includes not only "a promissory note or other simple acknowledgement of a debt owing [but] is held to include all contractual obligations to pay in the future for consideration presently received." (*United States* v. *Austin* (10th Cir. 1972) 462 F.2d 724, 736.) The installment notes in the present case fall squarely within that definition. ■ For the purpose of both the federal and the California securities law, an investment contract means a contract or transaction whereby a person invests money in a common enterprise with the expectation of deriving a profit solely from the efforts of a promoter or a third person. (*S.E.C.* v. *Howey Co.* (1946) 328 U.S. 293, 298-299 [90 L.Ed. 1244, 1249-1250, 66 S.Ct. 1100, 163 A.L.R. 1043]; *Securities & Exch. Com'n* v. *Glenn W. Turner*

---

[5]Preliminary hearing on the nine grand theft counts (counts I, IV, VII, X, XIII, XVI, XIX, XXII and XXV) was continued. At the continued hearing the parties stipulated that the matter could be determined on the basis of a summary of evidence filed by the People. After reviewing the summary the magistrate found that "People will not be able to prove up charges as filed" and dismissed the case, i.e., the grand theft counts. Apparently the People did not move to reinstate those counts.

[6]With the exceptions not here relevant, section 25019 provides: " 'Security' means any note; stock; treasury stock; membership in an incorporated or unincorporated association; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas or mining title or lease or in payments out of production under such a title or lease; any beneficial interest or other security issued in connection with a funded employees' pension, profit sharing, stock bonus, or similar benefit plan; or, in general, any interest or instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by a written document . . . ."

*Enter., Inc.* (D.Ore. 1972) 348 F.Supp. 766, 774; *People* v. *Skelton* (1980) 109 Cal.App.3d 691, 713 [167 Cal.Rptr. 636]; *People* v. *Park* (1978) 87 Cal.App.3d 550, 563 [151 Cal.Rptr. 146]; *Oil Lease Service, Inc.* v. *Stephenson* (1958) 162 Cal.App.2d 100, 109 [327 P.2d 628].) As the court explained in *Securities & Exch. Com'n* v. *Glenn W. Turner Enter., Inc., supra,* 348 F. Supp. at page 775: "The most essential consistency in the cases which have considered the meaning of 'investment contract' is the emphasis on whether or not the investor has substantial power to affect the success of the enterprise. When his success requires professional or managerial skill on his part, and he has authority corresponding with his responsibility, his investment is not a security within the meaning of the securities acts. When he is relatively uninformed and unskilled and then turns his money over to others, essentially depending upon their representations and their honesty and skill in managing it, the transaction is an investment contract."

 Here, the investors provided defendant with money with which to operate his business; in return for their investments they were promised a share of the gross income of the business; defendant managed, controlled and operated the business; the investors had no authority in its conduct; the profit on their investments depended solely on defendant's expertise, skill and honesty. It is true that the complaining witnesses, before making an investment, visited defendant's company and received some explanation of its operation and the product manufactured. However, there was no showing that they had any expertise in the manufacture of automobile parts and they may be described as "relatively uninformed" regarding the operation of defendant's business. Under these circumstances, the arrangements whereby the investors' interests were made manifest, involve investment contracts, regardless of the legal terminology in which such contracts were clothed.

In support of a contrary conclusion, respondent cites *People* v. *Davenport* (1939) 13 Cal.2d 681 [87 P.2d 346], wherein the Supreme Court held that an agreement for the purchase and sale of building and loan certificates, to be paid for in monthly installments with interest, was not an investment contract. Said the court: "The foregoing authorities serve to point the distinction between those transactions contemplated by the [Corporate Securities] act, and the contract involved in the instant case, where the only (asserted) '*profit*' contemplated by the alleged purchaser of the 'security' *was seven per cent interest on deferred payments of the purchase price.* All he had a right to expect by the transaction *was the payment of the agreed purchase price at the times stipulated,* plus the *interest* therein provided for. And as shown by the authorities herein cited, the expectation of the mere payment of *interest* does not transform the transaction into an 'investment'

contract within the meaning of the act. [Citations.] Nor was the seller of the certificate (the alleged purchaser of the 'security') *given any interest in any portion of the business*. Under the terms of the contract *he had a right to be paid whether the business prospered or not,* and, in the event of respondent's death, was even protected in the matter of payment by life insurance." (*People* v. *Davenport, supra,* 13 Cal.2d at p. 690; original italics.) Unlike the situation in *Davenport,* the instant case does not involve a purchase and sale transaction whereby the seller was entitled to the purchase price plus interest regardless of the success of the business. Here, by the terms of the instruments evidencing the transactions, defendant promised to pay each investor not only interest on the sums invested but also a specified share of the gross income of the business; the latter payment obviously depended on the success of the business.

■ Although the promissory notes in the present case constitute securities as that term is defined in the Corporate Securities Law, the crucial question nevertheless remains whether the transactions giving rise to the notes come within the regulatory purpose of the law. (*Silver Hills Country Club* v. *Sobieski* (1961) 55 Cal.2d 811, 814 [13 Cal.Rptr. 186, 361 P.2d 906, 87 A.L.R. 2d 1135]; *Hamilton Jewelers* v. *Department of Corporations, supra,* 37 Cal.App.3d 334-335.) ■ That purpose is "to protect the public against spurious schemes, however ingeniously devised, to attract risk capital. [Citations.] To effectuate this purpose the courts look through form to substance." (*Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d at p. 814.) ■ Defendant advertised in newspapers seeking money with which to conduct his business. He cast the transactions in the form of loans evidenced by promissory notes; however, the notes were unsecured and provided not only for payment of interest but also for payment of a portion of the gross income of the business. What defendant received in return for the notes was "risk capital" in the sense that a profit to the holders of the notes, as well as the return of their money, depended wholly on defendant's successful conduct of his business. " '[A]s a general rule, the sale of "securities" that is condemned by the courts involves an attempt by an issuer to raise funds for a business venture or enterprise; an indiscriminate offering to the public at large where the persons solicited are selected at random; a passive position on the part of the investor; and the conduct of the enterprise by the issuer with other people's money.' " (*Fox* v. *Ehrmantraut* (1980) 28 Cal.3d 127, 138 [167 Cal.Rptr. 595, 615 P.2d 1383]; *Silver Hills Country Club* v. *Sobieski, supra,* 55 Cal.2d at p. 815.) Each of these factors is present in the case at bench. The transactions here come within the purpose as well as the letter of the Corporate Securities Law and are typical of those transactions which were intended to be regulated by the law.

The order denying the People's motion to reinstate counts II, III, V, VI, VIII, IX, XI, XII, XIV, XV, XVII, XVIII, XX, XXI, XXIII, XXIV, XXVI and XXVII is reversed. The superior court is directed to order the magistrate to reopen the preliminary hearing for further proceedings.

Spencer, P. J., and Gutierrez, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.